# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
MCCRAE ASSOCIATES, LLC,          :
                                 :
      Plaintiff,                 :
                                 :
v.                               :    Civil No. 3:06CV1100(AWT)
                                 :
UNIVERSAL CAPITAL MANAGEMENT,    :
INC., MICHAEL QUEEN, WILLIAM     :
COLUCCI, JOSEPH DRENNAN,         :
THOMAS PICKARD, JEFFREY          :
MUCHOW and STEVEN PRUITT,        :
                                 :
      Defendants/Third-Party     :
      Plaintiffs,                :
                                 :
v.                               :
                                 :
STEPHEN FUNK,                    :
                                 :
      Third-Party Defendant.     :
-----------------------------x
```

## RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants and third-party plaintiffs Universal Capital
Management, Inc. ("UCM"), Michael Queen ("Queen"), William Colucci
("Colluci"), Joseph Drennan ("Drennan"), Thomas Pickard
("Pickard"), Jeffrey Muchow ("Muchow") and Steven Pruitt
("Pruitt")(collectively, the "Defendants") have moved for partial
summary judgment against plaintiff McCrae Associates, LLC
("McCrae").  They seek summary judgment on the Second Count,
Statutory Theft as to UCM; the Third Count, Breach of Fiduciary
Duty by Officer as to defendants Queen, Colucci and Drennan; the
Fourth Count, Civil Conspiracy by Officer as to defendants Queen,

Colucci and Drennan; the Fifth Count, Breach of Fiduciary Duty by Directors as to Queen, Drennan, Pickard, Muchow and Pruitt; the Sixth Count, Civil Conspiracy by Directors as to Queen, Drennan, Pickard, Muchow and Pruitt; and the Seventh Count, violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA"), as to the Defendants.

For the reasons set forth below, the motion is being granted except with respect to the claims against Queen in the Third and Fifth Counts.

## I. FACTUAL BACKGROUND

During the summer of 2004, Stephen Funk ("Funk"), who is the principal in McCrae, Queen, Colucci and Drennan began talks in Wilmington, Delaware to form UCM, a publicly-held venture capital company. Queen eventually became President and a director of UCM. Funk had informed Queen that he would not serve as an officer, employee or director of UCM, but he agreed to sit on UCM's Board of Advisors. Funk eventually received 500,000 shares of UCM stock. He requested that UCM issue 300,000 of these shares to McCrae, a company controlled by him and his wife, and 200,000 of these shares to Liberator LLC, a company controlled by his brother. While it is disputed whether Queen or Funk received the most shares, the parties agree that Funk received more shares than any of the other officers or directors of UCM.

On July 1, 2004, UCM executed Subscription Agreements, which

provided for the issuance of 300,000 shares to McCrae in exchange
for a $300 payment and 200,000 shares to Liberator in exchange for
a $200 payment.  However, the Subscription Agreements did not
include additional promises the Defendants allege Funk made,
including promises to identify potential acquisition targets for
UCM, to secure funding from outside investors for UCM, to identify
target acquisition companies, and to provide publicly registered
corporate shells to facilitate reverse mergers.  Funk did
introduce some investors to UCM, as well as further capitalize UCM
with 100,000 shares of another firm and establish other contacts.

Subsequent to the receipt by McCrae and Liberator of the
500,000 shares of UCM stock, Queen came to the conclusion that
Funk had not made a reasonable effort to identify a single
investment opportunity for UCM in three years, nor a meaningful
effort to raise investor funds to assist UCM in its acquisition
activities.  The Defendants contend that Funk had diverted to
other companies business opportunities that should have been
directed to UCM.  The Defendants further contend that Funk would
not have received the 500,000 shares of UCM stock if Funk had not
made promises and representations about the services he would
provide to UCM.

Queen concedes that there was no numerical requirement with
respect to the number of acquisition targets to be identified or
specific dollar amounts to be raised by Funk, nor any other

benchmarks that quantified Funk's supposed commitments.  Also,
Funk claims that he had informed Queen that he would continue to
do similar work on his own time, as he had in the past.

Nevertheless, the UCM directors, having "understood that
Stephen Funk had received his large ownership stake in the company
in exchange for Funk's commitment to play an active role in UCM's
business" and having "understood that Funk had reneged on his
commitments to UCM and that Mr. Queen did not want UCM to release
the McCrae and Liberator shares because Funk had lost the right to
own these shares," (Defs.' L.R. Stmt. (Doc. No. 112)("Defs.'
Stmt.") at ¶¶ 19, 20), allowed UCM to refuse to reissue McCrae's
shares when stock certificates for UCM were reissued in 2006.
Queen states that he made the decision "because Mr. Funk did not
fulfill commitments that he made to UCM and, thus, lost the right
to retain these shares."  (Defs.' Stmt., Ex. B, Decl. of Michael
D. Queen at ¶ 9.)  UCM still holds the stock certificates at issue
at its office in Delaware.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless
the court determines that there is no genuine issue of material
fact to be tried and that the facts as to which there is no such
issue warrant judgment for the moving party as a matter of law.
Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S.
317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22

F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of
summary judgment . . . against a party who fails to make a showing
sufficient to establish the existence of an element essential to
that party's case, and on which that party will bear the burden of
proof at trial."  See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must
respect the province of the jury.  The court, therefore, may not
try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire
Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce &
Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is
well-established that "[c]redibility determinations, the weighing
of the evidence, and the drawing of legitimate inferences from the
facts are jury functions, not those of the judge."  Anderson, 477
U.S. at 255.  Thus, the trial court's task is "carefully limited
to discerning whether there are any genuine issues of material
fact to be tried, not to deciding them.  Its duty, in short, is
confined . . . to issue-finding; it does not extend to issue-
resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be
resolved is both genuine and related to a material fact.
Therefore, the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment.  An issue is "genuine . . .

-5-

if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in [its] favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the

inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment."  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]."  Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings because the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact."  Weinstock, 224 F.3d at 41.  If the nonmovant

fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A. Seventh Count: CUTPA

CUTPA provides in relevant part that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

> "Trade" and "commerce" means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state.

Conn. Gen. Stat. § 42-110a(4). "Whether [a] defendant is subject to CUTPA is a question of law, not fact." Connelly v. Housing Authority, 213 Conn. 354, 364-65 (1990).

The Defendants argue that they are entitled to summary judgment on McCrae's CUTPA claim because the alleged wrongful acts complained of took place outside Connecticut and do not involve trade or commerce, as required under CUTPA. McCrae contends that CUTPA applies to the Defendants' alleged wrongful acts even though they occurred outside Connecticut because lex loci delicti is still the primary choice of law principle in Connecticut. The court finds persuasive both arguments advanced by the Defendants.

### 1. Choice of Law

CUTPA does not apply to a violation occurring outside Connecticut unless the violation is "tied to a form of trade or

commerce intimately associated with Connecticut," or Connecticut choice of law principles dictate the application of Connecticut law. Victor G. Reiling Assoc. & Design Innovation, Inc. v. Fisher-Price, Inc., 406 F. Supp. 2d 175, 200 (D. Conn. 2005)(quoting Uniroyal Chem. Co. v. Drexel Chem. Co., 931 F. Supp. 132, 140 (D. Conn. 1996)). There is no evidence that UCM's business is a form of trade or commerce intimately associated with Connecticut. Thus, the issue in this case is whether Connecticut choice of law principles dictate the application of Connecticut law.

In Abdullahi v. Pfizer, Inc., 562 F.3d 163 (2d Cir. 2009), the court observed that "[u]nder Connecticut law, lex loci delicti, the doctrine that the substantive rights and obligations arising out of a tort controversy are determined by the law of the place of injury, typically applies." Id. at 190 (emphasis added). However, the court further observed that:

> Connecticut, however, has conspicuously retreated from a rigid application of the doctrine. The Connecticut Supreme Court held that lex loci delicti does not apply to a tort claim when doing so would undermine expectations of the parties or an important state policy, produce an arbitrary and irrational result, or where "reason and justice" counsel for the application of a different principle. . . . In such cases, Connecticut courts are required to apply the "most significant relationship" analysis set forth in the Restatement (Second) of Conflict of Laws §§ 6 & 145 (1971) . . . O'Connor, 201 Conn. at 649-50 . . .

Id. Thus, the "most significant relationship" analysis is used only if one of three conditions is satisfied: (i) applying lex

loci delicti would undermine expectations of the parties or an important state policy, (ii) applying the doctrine would produce an arbitrary and irrational result, or (iii) reason and justice counsel for the application of a principle other than lex loci delicti.  In O'Connor v. O'Connor, 201 Conn. 632 (1986), the Connecticut Supreme Court did not "discard lex loci in all of its manifestations," but rather, relaxed the application of the principle.  Id. at 648.

Here, applying the doctrine of lex loci delicti would undermine expectations of the parties.  UCM is a Delaware corporation that conducts its affairs from its principal place of business in Wilmington, Delaware.  Negotiations relating to the formation of UCM and the issuance of UCM shares in accordance with McCrae's direction occurred in Delaware.  The Subscription Agreements that provided for the issuance of McCrae's UCM stock are governed by Delaware law.  UCM currently holds the stock certificates that are the subject of the dispute between the parties in Delaware, and the decision of UCM and the individual defendants to retain McCrae's shares of UCM stock occurred in Delaware.  In addition, none of the individual defendants are residents of Connecticut.  The only tie to Connecticut is that McCrae is located here.  Under these circumstances, the court concludes that it was the expectation of the parties that Delaware law would apply to any dispute arising out of the issuance of UCM

shares to McCrae.[1]

In <u>Abdullahi</u>, the court explained how Connecticut courts
apply the "most significant relationship" analysis set forth in
Sections 6 and 145 of the Restatement (Second) of Conflict of
Laws:

> Section 145(1) of the Restatement provides that "[t]he
> rights and liabilities of the parties with respect to an
> issue in tort are determined by the local law of the state
> which, with respect to that issue, has the most
> significant relationship to the occurrence and the parties
> under the principles stated in § 6." Restatement (Second)
> § 145(1). Section 6(2), in turn, provides that where a
> state is not guided by a statutory directive on choice of
> law,
>> the factors relevant to the choice of the
>> applicable rule of law include
>> (a) the needs of the interstate and
>> international systems,
>> (b) the relevant policies of the forum,
>> (c) the relevant policies of other interested
>> states and the relative interests of those
>> states in the determination of the particular
>> issue,
>> (d) the protection of justified expectations,
>> (e) the basic policies underlying the
>> particular field of law,
>> (f) certainty, predictability and uniformity of
>> result, and
>> (g) ease in the determination and application
>> of the law to be applied.
> Restatement (Second) § 6(2). The Connecticut Supreme Court
> has determined that Section 145(2) provides courts with
> guidance regarding the evaluation of the policy choices

---

[1]In addition, it appears that application of the doctrine
<u>lex</u> <u>loci</u> <u>delicti</u> would undermine an important state policy of
Delaware. Delaware has an interest of regulating the conduct of
corporations formed under its laws. <u>See</u> <u>In re English Seafood
(USA) Inc.</u>, 743 F. Supp. 281, 289 (D. Del. 1990)("The state of
Delaware has a strong interest in the formation and termination
of corporations under its laws and in the uniform development and
application of the statutory scheme that the state legislature
and courts have created to regulate those corporations.")

set out in Sections 145(1) and 6(2). <u>O'Connor</u>, 201 Conn.
at 652 . . . . Section 145(2) assists with the application
of the principles of Section 6 to tort cases by calling
for consideration of:
        (a) the place where the injury occurred,
        (b) the place where the conduct causing the injury
        occurred,
        (c) the domicil, residence, nationality, place of
        incorporation and place of business of the parties,
        and
        (d) the place where the relationship, if any,
        between the parties is centered.
Restatement (Second) § 145(2). These factors are "to be
evaluated according to their relative importance with
respect to the particular issue." Id.

<u>Id.</u> at 190-91.

    Evaluation of the factors in § 145(2), keeping in mind their

relative importance in the context of this case, leads the court

to conclude that Delaware law applies here.  The alleged injury

occurred in Connecticut because that is where UCM is located, and

thus, this factor favors application of Connecticut law.  However,

the conduct causing the alleged injury occurred in Delaware, and

the relationship between the parties is centered in Delaware.

These factors strongly favor application of Delaware law.  The

place of incorporation or formation and place of business of the

parties is a neutral factor.  Here, in the context of the issuance

of the shares of stock of a corporation, where shareholders of the

corporation could reside in any number of different states, the

place where the injury occurred is relatively less important than

the place where the conduct causing the injury occurred and the

place where the relationship between the parties is centered.

## 2. Involving Trade or Commerce

While CUTPA does not apply to purely intracorporate
conflicts, the Connecticut Supreme Court has distinguished the
situation where the alleged wrongdoer's actions go "well beyond
governance of the corporation, and [are] in direct competition
with the interests of the corporation." Fink v. Golenbock, 238
Conn. 183, 213 (1996). In Fink, for example, the court's analysis
was that:

> Golenbock asks us to focus solely on the relationship
> between the individual, as opposed to corporate, parties
> to determine whether CUTPA should apply. Characterizing
> the action as a dispute over the internal governance of
> the corporation, he argues that CUTPA does not extend to
> cover his actions. We disagree. Golenbock's actions went
> well beyond governance of the corporation, and placed him
> in direct competition with the interests of the
> corporation.

Id. By way of contrast, in Keaney v. Eastern Computer Exchange,
Inc., No. 3:03CV1893(RNC), 2004 WL 885100 (D. Conn. Apr. 21,
2004), the plaintiff entered into an agreement with the defendants
pursuant to which he became a one-third owner of a company in
exchange for his business development knowledge and expertise.
The plaintiff was paid a share of the profits for several years;
then the defendants refused to acknowledge him as a co-owner of
the business and failed to give him a share of the profits. The
plaintiff sued, claiming the defendants had violated CUTPA. The
court granted the defendants' motion for summary judgment, finding
that CUTPA did not apply as this was "an internal dispute over

disclosure and distribution of profits. . . ." Id. at *2.  See

also Russell v. Russell, 91 Conn. App. 619, 647-48 (2005)(while

defendant wrongfully retained proceeds from a life insurance

policy, he did not use them in manner that placed him in direct

competition with corporation, so dispute concerned only ownership

interest and distribution of insurance money, not business of

corporation); NatTel LLC v. SAC Capital Advisors, No.

3:04CV1061(JBA), 2005 WL 2253756, *12-13 (D. Conn. Sept. 16,

2005)(dismissing CUTPA claim where claims related to conduct that

allegedly diluted or obscured value of plaintiff's shares).

Similarly, here the wrongful conduct alleged by McCrae relates to

an internal corporate dispute and the distribution of shares in

the company.  There is no connection to any trade or commerce

carried on by UCM.

**B. Second Count: Statutory Theft**

UCM contends that Connecticut's statutory theft statute,

Conn. Gen. Stat. § 52-564, has no application to this dispute

because the claims are governed by Delaware law.  The court

agrees.

Section 52-564 provides:

Any person who steals any property of another, or
knowingly receives and conceals stolen property, shall pay
the owner treble his damages.

Conn. Gen. Stat. § 52-564.  McCrae argues that lex loci delicti is

the primary choice of law principle here because application of

-14-

Connecticut law would not produce an arbitrary or irrational result.  However, producing an arbitrary and irrational result is just one of the circumstances in which <u>lex loci delicti</u> does not apply to tort claims.  As discussed above, application of <u>lex loci delicti</u> in this case would undermine expectations of the parties, and accordingly, it should not be applied here.  The analysis under Restatement (Second) of Conflict of Laws §§ 145(1) and 6(2), in accordance with § 145(2), is the same here as with respect to the CUTPA claim. Therefore, the motion is being granted with respect to the claim pursuant to Conn. Gen. Stat. § 52-564.

## C. Third and Fifth Counts: Breach of Fiduciary Duty by Officers and Directors

The individual defendants move for summary judgment based on their contention that they are shielded from liability by the business judgment rule.  Delaware law governs these claims because "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation.  Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation."  <u>First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba</u>, 462 U.S. 611, 621 (1983).

"The directors of Delaware corporations have a triad of primary fiduciary duties: due care, loyalty, and good faith." <u>Emerald Partners v. Berlin</u>, 787 A.2d 85, 90 (Del. Supr. 2001).

Further:

> [t]he business judgment rule is a presumption that in
> making a business decision the directors of a corporation
> acted on an informed basis, in good faith and in the
> honest belief that the action taken was in the best
> interests of the company and its shareholders. . . . To
> rebut the presumptive applicability of the business
> judgment rule, a shareholder plaintiff has the burden of
> proving that the board of directors, in reaching its
> challenged decision, violated any one of its triad of
> fiduciary duties: due care, loyalty, or good faith. If a
> shareholder plaintiff fails to meet this evidentiary
> burden, the business judgment rule operates to provide
> substantive protection for the directors and for the
> decisions that they have made. If the presumption of the
> business judgment rule is rebutted, however, the burden
> shifts to the director defendants to prove to the <u>trier
> of fact</u> that the challenged transaction was entirely fair
> to the shareholder plaintiff.

<u>Id.</u>, at 90-91 (emphasis in the original)(internal quotations,

alterations, and citations omitted).  The court concludes that the

individual defendants other than Queen are entitled to summary

judgment on these claims for breach of fiduciary duty, based on

the business judgment rule.  The plaintiff has failed to create a

genuine issue of material fact as to good faith, duty of care or

loyalty, except as to Queen, and it has not done so with respect

to its claim of waste of corporate assets.

> Under Delaware law:

> A failure to act in good faith may be shown, for instance,
> where the fiduciary intentionally acts with a purpose
> other than that of advancing the best interests of the
> corporation, where the fiduciary acts with the intent to
> violate applicable positive law, or where the fiduciary
> intentionally fails to act in the face of a known duty to
> act, demonstrating a conscious disregard for his duties.

<u>In re Walt Disney Co. Derivative Litig.</u>, 906 A.2d 27, 67 (Del.

Supr. 2006).  See also In re J.P. Stevens & Co., Inc. Shareholders Litigation, 542 A.2d 770, 780-81 (Del. Ch. 1988)(noting that the court may review the substance of a business decision to determine if it is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.")  McCrae contends that by retention of McCrae's shares, the individual defendants have failed to act in good faith in all three of the ways enumerated in In re Walt Disney.

Funk had introduced some investors to UCM, further capitalized UCM with shares of another firm, and established other contacts.  However, Funk concedes that the shares were not a gift and that he agreed to sit on UCM's Board of Advisors.  He also concedes that he understood that, in exchange for the shares, he would do for UCM things similar to what he had done at Pennexx.  At Pennexx, Funk engaged in significant fundraising when he served as a shareholder of that corporation.  Furthermore, Funk concedes that he never identified a single portfolio company for UCM.  The record shows that Queen decided to withhold the reissued shares from Funk after Queen became aware of Funk's activities with respect to two other companies: Bioaccelerate and Tag Entertainment.  Furthermore, Queen explained the decision to UCM's board members, and the board members consulted with outside legal counsel in connection with their authorization to defend against McCrae's claims.

McCrae points to evidence that Queen was between jobs and trying to determine his career path, and that Queen expressed to Funk an interest in doing the kind of work that Funk was doing. McCrae also points to evidence that Queen stopped speaking to Funk once Funk made it clear to Queen that his role in UCM's business would not be as extensive as Queen asserts Funk agreed it would be. It also points to the fact that Queen only informed the other officers and directors of UCM of the decision to withhold McCrae's shares after the fact.

McCrae also makes arguments based on the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (the "40 Act"). These arguments fail because UCM's sale of founders' shares to Funk occurred in the summer of 2004, and at that time UCM was not yet operating as a business development company governed by the 40 Act. Also, there is no evidence that UCM received any consideration from its shareholders when UCM directed its transfer agent to reissue stock certificates to its shareholders in 2006.

While the evidence produced by McCrae creates a genuine issue of material fact as to whether Queen intentionally acted with a purpose other than that of advancing the best interests of the corporation, McCrae fails as to the other individual defendants to meet his burden at the summary judgment stage with respect to any of the potential bases for a conclusion that any of them failed to act in good faith. McCrae has failed to create a genuine issue as

to whether any of these defendants did not have a good faith belief that Funk's failure to fulfil his commitment to UCM was the reason for withholding the shares from McCrae. Therefore, these defendants are protected by the business judgment rule as to the duty of good faith.

The court also concludes that all of the individual defendants except Queen are entitled to summary judgment to the extent that the plaintiff's claims are based on breach of the duty of due care or the duty of loyalty. "[T]o invoke the [business judgment rule's] protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties. . . . [U]nder the business judgment rule director liability is predicated upon concepts of gross negligence." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984).

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. 1993)(citation omitted). "Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit

from a transaction not received by the shareholders generally."
Id. at 362.

The evidence as to the duties of due care and loyalty is
substantially the same as the evidence as to the duty of good
faith.  As to Queen, genuine issues of material fact exist as to
whether he violated these duties.  As to the remaining individual
defendants, McCrae fails to create a genuine issue as to whether
they neglected to take steps to obtain material information
reasonably available to them and then act with requisite care, or
put any self interest ahead of the best interest of the
corporation and its shareholders.

McCrae also contends that the individual defendants breached
their fiduciary duties by wasting corporate assets.  "[W]aste
entails an exchange of corporate assets for consideration so
disproportionately small as to lie beyond the range at which any
reasonable person might be willing to trade. Most often the claim
is associated with a transfer of corporate assets that serves no
corporate purpose; or for which no consideration at all is
received.  Such a transfer is in effect a gift."  Lewis v.
Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997)(citation omitted).
"The test for corporate waste is a stringent one and requires that
the plaintiff plead facts showing that no person of ordinary sound
business judgment could view the benefits received in the
transaction as a fair exchange for the consideration paid by the

corporation." <u>In re Lear Corp. Shareholder Litigation</u>, 967 A.2d 640, 656 (Del. Ch. 2008)(internal quotation mark and citation omitted).

McCrae points to UCM's monthly operating costs of $90,000 and the fact that UCM is in such poor financial condition. It also points to the fact that UCM has borrowed and is in default on two promissory notes yet is expending funds for legal fees in connection with this lawsuit. However, while McCrae characterizes the expenditures as being reckless and for services of dubious value, it fails to produce evidence that could support a conclusion that corporate assets have been wasted. The mere fact that UCM has significant operating costs, is in poor financial shape and persists in defending itself in this lawsuit can not support a conclusion under the applicable standard that there has been a waste of corporate assets.

Therefore, as to the Third and Fifth Counts, the motion is being denied as to Queen and granted as to the other individual defendants, but even as to Queen being granted with respect to the claim of waste of corporate assets.

### D. Fourth and Sixth Counts: Civil Conspiracy

"The elements of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the

scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." Harp v. King, 266 Conn. 747, 778-79, (2003).  Those employees "acting in the scope of their employment cannot conspire with one another or with the corporation that employs them; each acts for the corporation and the corporation cannot conspire with itself." Id. at 778.  Furthermore,

> [i]f the measure of the applicability of that . . . doctrine was keyed to the alleged wrongdoing of corporate officers, it would quickly become a meaningless concept. In every case of conspiracy . . . there are necessarily accusations of wrongful conduct.  The test therefore is not the wrongful nature of the conspirators' actions but whether the wrongful conduct was performed within the scope of the conspirators official duties.

Id. at 785-86 (internal citations and brackets omitted).

McCrae asserts that an exception to the intracorporate conspiracy doctrine applies because the alleged wrongful conduct by the individual defendants was not performed within the scope of their official duties.  However, the only evidence to which it points is evidence of actions taken by them in their capacities as officers and/or directors.  The plaintiff has failed to create a genuine issue as to whether the intracorporate conspiracy doctrine applies here.  Therefore, the motion is being granted as to the Fourth and Sixth Counts.

## IV. **CONCLUSION**

For the reasons set forth above, the Motion of Defendants/Third-Party Plaintiffs For Partial Summary Judgment (Doc. No. 111) is hereby GRANTED in part and DENIED in part.  The

motion is being granted with respect to the Second Count, Statutory Theft; granted with respect to the Third Count, Breach of Fiduciary Duty by Officer as to defendants Colucci and Drennan and denied as to defendant Queen; granted with respect to the Fourth Count, Civil Conspiracy by Officer; granted with respect to the Fifth Count, Breach of Fiduciary Duty by Directors as to defendants Drennan, Pickard, Muchow and Pruitt and denied as to defendant Queen; granted with respect to the Sixth Count, Civil Conspiracy by Directors; and granted with respect to the Seventh Count, violation of the Connecticut General Statutes § 42-110a et seq. ("CUTPA").

The Clerk shall enter partial judgment accordingly.

It is so ordered.

Signed this 29th day of September 2010 at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
